IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TERRI MILLIRON,                )
                               )
            Plaintiff,         )   CIVIL ACTION NO. 3:06-262
                               )
v.                             )
                               )   JUDGE KIM R. GIBSON
PILOT TRAVEL CENTERS, LLC,     )
                               )
                               )
            Defendant.         )

## MEMORANDUM OPINION

**Gibson, J.,**

Presently before the Court is the Motion for Summary Judgment (Doc. No. 30) filed by Defendant Pilot Travel Centers, LLC ("Pilot"). The event at the root of this matter is Pilot's firing of Plaintiff Terri Milliron, who now claims that Pilot violated federal and state laws by discriminating against her because of her age. Pilot denies this allegation, and argues that Ms. Milliron does not present sufficient evidence of a discriminatory motive; because this Court finds that no genuine issue of material fact exists and no reasonable jury could find in favor of Ms. Milliron, Pilot is entitled to judgment as a matter of law and its Motion will be granted.

### I. Procedural History

Ms. Milliron's Complaint asserts claims against Pilot for violations of the Age Discrimination in Employment Act, 29 U.S.C. § 623 *et seq.* ("ADEA"), and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951 *et seq.* Ms. Milliron requests relief in the form of back pay, front pay, salary, pay increases, bonuses, medical and other benefits, training promotions, pension, seniority, compensatory damages, consequential damages, double damages pursuant to 29

U.S.C. 626(b) for willful violation of the ADEA, court costs and legal fees, and injunctive and declaratory relief. Defendant filed its Answer on January 12, 2007, and then moved for Summary Judgment on December 14, 2007, pursuant to Federal Rule of Civil Procedure 56(c). Plaintiff replied to Defendant's motion on January 30, 2008. Both parties populated the record with the requisite supporting documentation. Defendant's Motion is now poised for disposition.

**II. Jurisdiction and Venue**

This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331 and 1343, and pursuant to the doctrine of supplemental jurisdiction. Venue is proper under 28 U.S.C. 1391(b).

**III. Factual Setting**

Pilot owns and operates more than 260 retail fuel centers in 39 or more states; these centers provide services and merchandise to travelers and over-the-road cargo haulers. Defendant's Statement of Facts ("DSOF") ¶ 1; Plaintiff's Statement of Facts ("PSOF") ¶ 1. Pilot employs approximately 13,000 employees nationwide. DSOF ¶ 3. Within its centers, Pilot operates franchises of several restaurants, including Arby's, Wendy's, and Subway. DSOF ¶ 2.

Pilot operates a Travel Center known as Unit # 336 at 1742 Rich Highway, Dubois, Pennsylvania, which contains an Arby's restaurant. DSOF ¶ 4. Unit # 336 employs 40 full and part-time employees on average. DSOF ¶ 5. Pilot also maintains a Travel Center known as Unit #001 at 5868 Nittany Valley Drive, Mill Hall, Pennsylvania, which contains a Subway restaurant. DSOF ¶ 6. Every Travel Center operated by Pilot is supervised by a General Manager. DSOF ¶ 7. Pilot Travel Centers that contain a restaurant franchise have a Restaurant General Manager to supervise the restaurant portion of the travel center. DSOF ¶ 8.

Pilot maintains a Code of Conduct and a Substance Abuse Policy contained in its Field Operations Team Member Handbook. DSOF ¶ 9. Among the directives in the Code of Conduct is the statement: "One of the most important assets of [Pilot] is the trust and confidence of our guests and general public. With this in mind, [Pilot] expects and demands honesty, integrity, discretion, and professionalism in both business and personal conduct from all of its Team Members." DSOF ¶ 10. Additionally, the Code of Conduct states: "When [Pilot] Team Members demonstrate that they cannot abide by these conduct standards, it can lead to corrective actions up to and including termination." DSOF ¶ 11. A provision of Pilot's Substance Abuse Policy indicates that it is a violation of the policy "to use, possess, sell, trade, offer for sale, or offer to buy illegal drugs or otherwise engage in the illegal use of drugs (prescription or nonprescription) on the job or off the job where such conduct has any effect whatsoever on Pilot, its reputation or the reputation of [Pilot] Team Members." DSOF ¶ 12. Violations of Pilot's Substance Abuse Policy "are subject to disciplinary action up to and including termination." DSOF ¶ 13.

Ms. Milliron became the Restaurant General Manager of the Arby's located at Pilot's Unit #336 in DuBois in October 1998. DSOF ¶ 14. As Restaurant General Manager, Ms. Milliron carried responsibilities including the enforcement of all Pilot policies and procedures in the restaurant she managed, as well as responsibility for the company's adherence to all local, state, and federal laws and regulations. DSOF ¶ 15. Ms. Milliron was also responsible for the following: recruiting and supervising staff members, some of whom were minors; training and development of team members; and reviewing lower level managers and team members. DSOF ¶ 16.

On the morning of January 31, 2006, the Pennsylvania State Police Clandestine Lab Response Team executed a search warrant at Ms. Milliron's home. DSOF ¶ 18. Probable cause for

the search warrant was established from trash pulls performed at the residence. DSOF ¶ 19. When the warrant was executed, Ms. Milliron was working her scheduled shift at Pilot. DSOF ¶ 20. A friend of Ms. Milliron's arrived at the Dubois Travel Center and told Ms. Milliron that people in white suits were at her house with vans and tables set up outside. DSOF ¶ 21. Later in the day, Michelle returned to Pilot to update Ms. Milliron on the State Police's activities at her home. DSOF ¶ 22.

At and around the time the warrant was executed, Milliron cohabited with her erstwhile paramour, Steven Sunealitis. DSOF ¶ 23. On the day of the police raid, Mr. Sunealitis' sister, Carolyn Franc, phoned Ms. Milliron at work to inform her that neighbors called Mr. Sunealitis' brother to tell him that something was happening at Milliron's residence. DSOF ¶ 24.

After Ms. Milliron completed certain of her shift duties that day, she delegated remaining duties to a subordinate and left the restaurant. DSOF ¶ 25; PSOF ¶ 25. Ms. Milliron left a note for her immediate supervisor, Gary Senior ("Senior"), explaining her early departure from the restaurant. DSOF ¶ 26. Ms. Milliron claimed to be in a total state of shock as a result of the police raid at her house. PSOF ¶ 174. According to Regional Manager Robert Thorsen ("Thorsen"), the General Manager has discretion to decide whether someone's departure from work under emergency circumstances is reasonable. PSOF ¶ 150. Mr. Thorsen stated that although he was not Ms. Milliron's General Manager, he thought it was unreasonable for Milliron to have left work that day. PSOF ¶151.

The next day, February 1, 2006, Ms. Milliron spoke with Mr. Senior about her interactions with the police. DSOF ¶ 27. Ms. Milliron worked for a couple of hours that day and then left work to meet with her attorney; Mr. Senior told her to leave work to take care of her personal matters.

4

DSOF ¶29; PSOF ¶29. Later that day, Ms. Milliron went to the Punxatawney State Police barracks to find out whether she was going to be charged with a crime and whether she would lose her house. DSOF ¶30.

On February 2, 2006, the local newspaper printed an article that identified the items seized by the police during the execution of the warrant, although Ms. Milliron's identity was not disclosed in the article. DSOF ¶ 31; PSOF ¶ 31. According to the article, items seized during the police raid included a quart jar with a bi-level liquid of suspected methamphetamine oil, clear vinyl tubing that contained an unknown yellow liquid, a pint glass jar with an unknown black residue, one gallon cans of Coleman fuel, muriatic acid, xylene, a plastic strainer, two bottles of Red Devil lye, a glass mortar and pestal with ground-up pseudoephederine pills on it, a glass pie plate with methamphetamine, one electronic scale, two glass jars with white residue on them, assorted plastic funnels, and a large amount of plastic ziplock baggies, although the article did not connect any of these items to Ms. Milliron, and Ms. Milliron denies having knowledge that these items were anywhere on her property. DSOF ¶ 32; PSOF ¶ 32. The article claimed that these items, along with additional items seized during the raid, are used in the manufacture of illegal methamphetamines. DSOF ¶ 33. The article further stated that Mr. Sunealitis was arrested after three small plastic baggies containing approximately three grams of methamphetamine were discovered in his wallet. DSOF ¶ 34. Thorsen reported to Jecker that the article caused "quite a stir" in the store. PSOF ¶ 169. The newspaper article never mentioned Ms. Milliron or Pilot. PSOF ¶ 139.

That day, Mr. Senior forwarded both Ms. Milliron's note and the newspaper article to Regional Manager Robert Thorsen. DSOF ¶ 35. Mr. Thorsen, in turn, faxed the note and the newspaper article to Zone Human Resources Manager Al Jecker. DSOF ¶ 36. Mr. Thorsen then

suspended Ms. Milliron pending an investigation, despite her protestations that she had nothing to do with the suspected methamphetamine lab and that she would submit to a drug test. PSOF ¶¶ 119, 129. Mr. Thorsen conducted an investigation. PSOF ¶ 130. This investigation consisted of Mr. Thorsen and Mr. Jecker reviewing the newspaper article, Pilot's Code of Conduct Policy, Pilot's Substance Abuse Policy, Ms. Milliron's note, and, according to Defendant, conversations with Ms. Milliron, Mr. Senior, Mr. Jecker and Mrs. Laura Cheatham. PSOF ¶ 131; Defendant's Response to Plaintiff's Counterstaement of Material Facts ("DRPSOF") ¶ 131. Mr. Thorsen is unsure of the length of the investigation. PSOF ¶ 132. By telephone, Mr. Thorsen spoke with Ms. Milliron about the newspaper article; during this conversation, Ms. Milliron confirmed that her house was the target of a police raid and that Sunealitis was arrested. DSOF ¶ 37; PSOF ¶ 119. Mr. Thorsen informed Ms. Milliron that her taking a drug test was unnecessary. PSOF ¶ 122. Thorsen stated he did not know whether he had any concern that Ms. Milliron was taking drugs, indicating that it was not "relevant at the time." PSOF ¶¶ 123-24. Mr. Thorsen wanted to take his time and perform due diligence in looking at the circumstances. PSOF ¶ 125. Mr. Jecker relied on Mr. Thorsen to conduct a thorough investigation. PSOF ¶ 167.

On February 3, 2006, Mr. Thorsen terminated Ms. Milliron, informing her that she had violated the Code of Conduct Policy and the Substance Abuse Policy; he did not specify the nature of her violation. DSOF ¶ 40; PSOF ¶¶ 40, 135. Mr. Thorsen stated that Ms. Milliron's association with people who were using drugs, coupled with the small community setting in which she lived and worked, made her continued employment an unhealthy way to run a business. PSOF ¶ 140. Mr. Thorsen believed the local community would connect the newspaper article with Ms. Milliron and consequently Pilot. PSOF ¶ 141. Pilot was allegedly concerned that parents would remove their

under-18 employees from the DuBois store based upon the newspaper article about the police raid. PSOF ¶ 172. It is unknown if any minors were employed at the DuBois store at that time, but no Pilot employees were removed as a result of the incident at Ms. Milliron's house. PSOF ¶ 173.

Immediately after Ms. Milliron was fired, Mr. Thorsen requested that Mildred Eagle ("Eagle"), a 56 year-old Restaurant General Manager at another Pilot Travel Center located in Girard, Ohio, temporarily replace Milliron in DuBois. DSOF ¶ 41. Marjorie Durost, a 43 year-old Restaurant General Manager at Pilot's Mill Hall, Pennsylvania location, next filled Milliron's position in DuBois after her store burned down. DSOF ¶¶ 42-43; PSOF ¶¶ 42-43. Ms. Durost returned to her position as Restaurant General Manager in Mill Hall after that store was reconstructed. DSOF ¶¶ 44-45; PSOF ¶¶ 44-45.

Around this time, Mr. Thorsen interviewed 32 year-old Sean Duffy for either a Restaurant General Manager position or an Assistant Restaurant Manager position with Pilot. DSOF ¶¶ 46-47; PSOF ¶¶ 46-47. On April 10, 2006, Pilot hired Mr. Duffy as Restaurant General Manager at the Pilot DuBois Travel Center; after completing Arby's training, Mr. Duffy spent three weeks in that position before being transferred to an open Restaurant General Manager position in Newburgh, New York. DSOF ¶¶ 47-48; PSOF ¶¶ 47-48. Mr. Duffy did not request the transfer. PSOF ¶ 102. Mr. Thorsen phoned Duffy and requested that he transfer to the Newburgh store beginning in June 2006. PSOF ¶ 103. Mr. Thorsen was not the regional manager for the Newburgh location, and Mr. Duffy never spoke to the actual regional manager for that location before beginning his duties there. PSOF ¶ 104. Ms. Durost continued working in DuBois even after Mr. Duffy's arrival and subsequent transfer, because construction on the Mill Hall location had not been completed. DSOF ¶50; PSOF ¶ 50. While both Mr. Duffy and Ms. Durost worked at the DuBois location, Ms. Durost took

7

direction from Mr. Duffy. PSOF ¶ 97.

On July 10, 2006, Pilot hired Ms. Rebecca Wazelle as the Restaurant General Manager at the DuBois Travel Center. DSOF ¶ 51; PSOF ¶ 51. Ms. Wazelle was 39-years-old when she assumed her duties at the DuBois Travel Center. DSOF ¶ 52.

Ms. Milliron claims that two younger Pilot employees, Ms. Tammy Clinchoc and Mr. Joseph Domitrovich, received more favorable treatment than she regarding their drug-related charges. DSOF ¶ 57. At the time of Ms. Milliron's termination, Ms. Milliron was 41-years-old, Mr. Clinchoc was 39-years-old, and Mr. Domitrovich was 22-years-old. DSOF ¶ 58. Ms. Clinchoc's position was a crew member at the Arby's managed by Ms. Milliron. DSOF ¶ 59. Mr. Domitrovich was a maintenance employee. DSOF ¶ 60. Neither Ms. Clinchoc nor Mr. Domitrovich performed any supervisory duties. DSOF ¶ 61.

In June, 2006, Mr. Domitrovich was charged with marijuana possession and various other marijuana-related crimes, for which he spent six days in jail. DSOF ¶ 62; PSOF ¶ 62. Upon his release, he continued to be employed by Pilot for three weeks. *Id.* In July, 2006, Pilot terminated Mr. Domitrovich. *Id.* However, a few months later, Pilot re-hired Ms. Domitrovich. DSOF ¶ 63; PSOF ¶ 63. Mr. Thorsen stated an exception was made for Mr. Domitrovich based upon representations by Mr. Domitrovich's attorney that he would be acquitted. PSOF ¶ 163; DRPSOF ¶ 163. However, Mr. Domitrovich pled guilty and was convicted of the charges against him. DSOF ¶ 64; PSOF ¶ 64. On June 25, 2007, Domitrovich resigned from his employment with Pilot. DSOF ¶65. Mr. Thorsen claimed to hold Ms. Milliron to a higher standard because she was the "face of our organization in that community"; therefore, Mr. Thorsen did not see the cases of Mr. Domitrovich and Ms. Milliron as related. PSOF ¶ 164.

8

Ms. Clinchoc began her employment with Pilot in September 2004. DSOF ¶ 67. Prior to being hired by Pilot, Ms. Clinchoc was involved in a drug transaction with an undercover government informant. DSOF ¶ 68. In March 2006, Ms. Clinchoc was charged or sentenced for these crimes. DSOF ¶ 69; PSOF ¶ 69. At that time, Ms. Clinchoc entered the Accelerated Rehabilitative Disposition program, and was sentenced to two years' probation. DSOF ¶ 70. Clinchoc was not a Pilot employee at the time of her cocaine possession, and therefore did not violate Pilot's Substance Abuse Policy. DSOF ¶ 71. While on probation, Ms. Clinchoc was subject to random drug testing. DSOF ¶ 72. Ms. Clinchoc failed a drug test on March 12, 2007. DSOF ¶73. After learning of the failed drug test, Pilot terminated Ms. Clinchoc for violating its Substance Abuse Policy. DSOF ¶74.

Mr. Thorsen stated that Pilot's Substance Abuse Policy applies equally to all Pilot employees and is required to be enforced fairly and without exceptions. PSOF ¶ 165.

After Pilot received an EEOC complaint concerning Ms. Milliron, Ms. Cheatham conducted an investigation that consisted of speaking to Messrs. Senior, Jecker, and Thorsen, and also reviewing payroll records, reviewing the February 2, 2006, newspaper article, reviewing Milliron's note, and reviewing Pilot's Code of Conduct and Substance Abuse Policies. PSOF ¶ 176; DRPSOF ¶ 176.

## IV. Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." Fed. R. Civ. P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 249. A court is to draw all reasonable inferences in favor of the nonmoving party. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party."). The Third Circuit explained:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

*Id.*

## V. Discussion

The ADEA makes it unlawful for an employer to discriminate against any person with respect to compensation, terms, conditions, or privileges of employment on the basis of age. 29 U.S.C. § 623(a)(1) ("It shall be unlawful for an employer–(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age"). The Act limits its protection to individuals forty years of age and older. 29 U.S.C. § 631(a).

Pilot's first argument in support of its motion for summary judgment is that Ms. Milliron

10

cannot establish a *prima facie* case of age discrimination under the ADEA and the PHRA.[1]

To establish a *prima facie* case of age discrimination under the ADEA, Ms. Milliron must show that she: "(1) is over forty; (2) is qualified for the position in question; (3) suffered an adverse employment decision; and (4) was replaced by a significantly younger individual to permit an inference of age discrimination." *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 330 (3d Cir. 1995); *see also Hill v. Borough of Kutztown*, 455 F.3d 225, 247 (3d Cir. 2006).

The first three elements of a *prima facie* case are met here: Ms. Milliron is a member of the protected class; she is qualified for the position; and her termination constituted an adverse employment decision. However, Pilot argues that Ms. Milliron fails to establish the fourth element: that she was replaced by a significantly younger individual to permit an inference of age discrimination. Pilot argues that Ms. Milliron's permanent replacement at the DuBois Travel Center was Ms. Durost, who was 43-years-old. However, Ms. Milliron insists that her official permanent replacement was not Ms. Durost, but rather Mr. Duffy, who was 32-years-old. Pilot counters that Mr. Duffy was not offered the position in DuBois until after it decided to rebuild Mill Hall, and after Ms. Durost requested to return to that location. Ms. Milliron counters that the reconstruction of Mill Hall was never in doubt, that Duffy was hired in the first instance for DuBois, and that the reason Duffy was transferred after only three weeks at the DuBois Travel Center was because the managers and supervisors of the DuBois Travel Center learned that Milliron was planning to file an age discrimination claim. After Duffy was transferred, Pilot hired Ms. Wazelle, 39, to take over the Restaurant General Manager position at the DuBois Travel Center.

---

[1] "The same legal standard applies to both the ADEA and the PHRA and therefore it is proper to address them collectively." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 466 n. 1 (3d Cir. 2005).

11

The Court finds that Milliron has, at the very least, established that a genuine issue of material fact exists as to who Milliron's true replacement was, and as such, summary judgment in favor of Defendant, based upon Plaintiff's failure to establish a *prima facie* case, is inappropriate. This finding is consistent with the instructions give to this Court by the Third Circuit, which explained that "we have repeatedly emphasized that the requirements of the *prima facie* case are flexible, and in particular that 'the fourth element must be relaxed in certain circumstances....'" *Pivirotto v. Innovative Sys. Inc.*, 191 F.3d 344, 357 (3d Cir. 1999) (quoting *Torre v. Casio, Inc.*, 42 F.3d 825, 831 (3d Cir. 1994)). Keeping in mind that establishing a *prima facie* case is not intended to be an onerous burden on plaintiff,[2] and allowing Milliron all reasonable inferences, the Court finds that Milliron has met her burden of establishing a *prima facie* case.

Once a plaintiff has established a *prima facie* case, the Court must then embark on the analysis advanced by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), to determine whether a plaintiff has established a right to relief on a discrimination claim.

This now-familiar burden-shifting framework is a tool for courts to utilize in analyzing disparate treatment claims. Both parties agree that the *McDonnell Douglas* analysis applies to plaintiff's ADEA claim. The *McDonnell Douglas* framework requires a plaintiff alleging a violation of the ADEA to first establish a *prima facie* case of discrimination, which, as stated above, the Court finds that Milliron has done. The *prima facie* case "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *see also id.* at n.6. In so doing, "the *prima facie* case 'raises

---

[2]*See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" *Id.*

If the plaintiff successfully demonstrates a *prima facie* case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *Simpson v. Kay Jewelers*, 142 F.3d 639, 644 n.5 (3d Cir. 1998). The burden on the defendant at this juncture is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, *taken as true*, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision. . . ." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)(emphasis added)(citations omitted).

Once the defendant offers a legitimate nondiscriminatory reason for the challenged conduct at issue, "'the *McDonnell Douglas* framework–with its presumptions and burdens'–disappear[s], . . . and the sole remaining issue [is] 'discrimination *vel non*,' . . . ." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)(citations omitted). Ms. Milliron, then, bears the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination. *Jones v. School Dist. of Philadelphia,* 198 F.3d 403, 410 (3d Cir. 1999).

Pilot's offered legitimate, non-discriminatory reason for terminating plaintiff was Milliron's violation of Pilot's Code of Conduct and Substance Abuse Policies. Specifically, Pilot asserts that it terminated Ms. Milliron because the discovery of a methamphetamine lab at her residence violated Pilot's Code of Conduct and Substance Abuse Policies. Also, Pilot avers that following the police raid on Ms. Milliron's house, her shift abandonment on that day, and the publication of the newspaper article detailing the items seized from Milliron's house, Messrs. Thorsen and Jecker lost

confidence in Milliron's ability to effectively manage the restaurant at the DuBois Travel Center. The Court accepts this stated reason as a legitimate, non-discriminatory reason for the adverse employment action; therefore, the Court finds that Pilot meets its burden of production.

Thus, Milliron is now tasked to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence' . . . ." *Id.* at 765 (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992) (emphasis in original). Furthermore, Ms. Milliron needs to show more than that Pilot's decision was "wrong or mistaken," but that the decision was actually motivated by discriminatory animus. *Id.* "Put another way, to avoid summary judgment the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered nondiscriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, that the proffered reason is a pretext)." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008).

One way to establish pretext is for a plaintiff to submit evidence that would convince a reasonable factfinder that the employer's stated legitimate, nondiscriminatory reason for the employment action is "unworthy of credence." *Fuentes*, 32 F.3d at 764. Typically, under this test, a plaintiff must show that the employer's stated reason for the adverse employment action is so implausible that a reasonable factfinder could not believe it. *See Brewer*, 72 F.3d at 329 (explaining

14

that "[a] fact-finder could find it implausible that [defendant] would have fired [plaintiff] for such deficiencies when he was successful in the sole area identified by [defendant]'s own performance incentive program–sales.").

Ms. Milliron claims that the proffered reasons for her termination are pretextual, because the note Ms. Milliron wrote on January 31, 2006, before leaving her Pilot store contained nothing warranting her termination and that neither Senior nor Jecker came to any conclusion after reading it. Ms. Milliron also argues that nothing in the newspaper article connects the police raid to either her or Pilot, and that Mr. Jecker's investigation into the matter was insufficient. Ms. Milliron further argues that Pilot does not have any evidence that anyone in the community made a connection between the police raid, Ms. Milliron, and Pilot. Furthermore, Ms. Milliron argues that newspaper articles about Ms. Clinchoc's and Mr. Domitrovich's drug activities were published, and they were not fired; given this difference, Ms. Milliron asserts that Pilot enforced its Substance Abuse Policy in a discriminatory manner. Additionally, Ms. Milliron argues that Pilot is unable to specify which provision of the Substance Abuse Policy she allegedly violated. She further argues that she had no knowledge of the methamphetamine lab operating in her home, that no one at Pilot believed that she was involved in illegal activity, and that Pilot failed to set up a drug test for her, despite her volunteering to submit to one.

Upon consideration of this evidence, the Court is not persuaded that Ms. Milliron has produced substantial evidence that Pilot's proffered reason for her termination is implausible or "unworthy of credence." First, the majority of Ms. Milliron's argument focuses upon Pilot's perceived improper reaction to the events surrounding the police raid on her home; such argument does not show that Pilot was motivated by age-based animus. Rather, Ms. Milliron offers only a

15

conclusory statement that putatively follows from her attacks upon Pilot's offered reasons: "[t]he only inescapable conclusion is that Ms. Milliron was treated differently, because of her age." Pl.'s Br. p. 20.

Further, much of Ms. Milliron's argument cites facts that were not known by Pilot at the time of the adverse employment action. In hindsight, given all the evidence before the Court, it perhaps could be argued that Ms. Milliron did not actually violate the Code of Conduct or Substance Abuse Policies. However, the Court cannot replace Pilot's business judgment, which was based on the information known at the time of Milliron's termination, with its own judgment based in part upon after-acquired facts and evidence, not known to Pilot at the time of its decision. *See Doan v. Seagate Tech. Inc.*, 82 F.3d 974, 978 (10th Cir. 1996) ("Financial evidence suggesting that a decision, in hindsight, may not have been prudent is not evidence of improper motive; the ADEA is not violated by erroneous or even illogical business judgment."); *Brown v. Holy Name Church*, 80 F.Supp.2d 1261, 1270 (D. Wyo. 2000) ("the employer's articulated legitimate business reason does not become pretextual even if it turns out to be, in hindsight, an exercise of bad business judgment."). More importantly, as stated above, even if Pilot's decision to terminate Milliron was improper, Milliron has produced no evidence that it was motivated by animus towards her because of her age; such is obviously necessary to maintain a claim under the ADEA. In short, it is not a violation of the ADEA or the PHRA to fire someone for an unsound reason; rather, the law prohibits adverse employment actions motivated by discriminatory rationales. This Court, or even a jury, may disagree with Pilot's business judgment; furthermore, the Court may even disagree with the morality of Pilot's actions. However, such is of no concern in an age discrimination lawsuit; Ms. Pilot has not presented direct evidence that age played any role whatsoever in the firing, and furthermore, she has not produced

any evidence that would allow a reasonable jury to conclude that Pilot's proffered reason is incredible.

Under these circumstances, the Court finds that a reasonable factfinder could not conclude that Pilot's legitimate, non-discriminatory reason for Milliron's termination was so implausible as to be "unworthy of credence" and was therefore a mere pretext for age discrimination.

A second way to establish pretext is for a plaintiff to produce sufficient evidence that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 762. To survive summary judgment under this test, the Third Circuit explained:

> To show that discrimination was more likely than not a cause for the employer's action, the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that age was a motivating or determinative factor in the employment decision.

*Simpson*, 142 F.3d at 644-45.

The types of evidence considered sufficient under this analysis by the Third Circuit include whether the employer previously discriminated against the Plaintiff, whether the employer has discriminated against other persons within the Plaintiff's protected class or within another protected class, and whether the employer more favorably treated similarly situated persons, not within the protected class. *Id.*

Ms. Milliron advances no argument, nor produces any evidence, that Pilot previously discriminated against her or that Pilot discriminated against other persons within her protected class or within another protected class.

Finally, Ms. Milliron attempts to show pretext by arguing that Pilot more favorably treated

17

similarly situated persons not within the protected class, namely Ms. Clinchoc and Mr. Domitrovich. Ms. Milliron argues that although Ms. Clinchoc, 39-years-old at the relevant time, and Mr. Domitrovich, 22-years-old at the relevant time, had drug related issues which were also reported in the newspaper, Pilot continued to employ them. Furthermore, in the case of Mr. Domitrovich, Pilot actually rehired him after having terminated him once. Ms. Milliron asserts that she was similarly situated to these two individuals, even though Ms. Clinchoc was a crew member under her supervision, while Mr. Domitrovich was a maintenance worker with no supervisory responsibilities. Ms. Milliron's supposed basis for this alleged similarity is that the Substance Abuse Policy applied equally to every Pilot employee.

In response to this argument, Pilot avers that Ms. Milliron was not similarly situated to the two individuals mentioned, because she was employed in a supervisory position while they were not. Furthermore, Pilot avers that Ms. Milliron's argument selectively chooses comparators Ms. Clinchoc and Mr. Domitrovich, while ignoring a significant group of other comparators who were terminated for violating the Substance Abuse Policy.

The Third Circuit explains that "[i]n order to determine who might qualify as a similarly situated employee we must look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace." *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 305 (3d Cir. 2004). *See also Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996) (proposed comparable employees must be similarly situated in all "material respects"); *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir. 1994) ("[i]n order for two or more employees to be considered similarly situated . . . the plaintiff must prove that all of the relevant aspects of his employment situation are nearly identical to those of the employees who he

18

alleges were treated more favorably."); *Dowling v. Citizens Bank*, 2007 WL 2752178, at *1 (W.D.Pa. Sept. 19, 2007) ("Clearly, Teresa Rotondo was not a similarly situated comparator to plaintiff because Rotondo was a non-management employee and under plaintiff's direct supervision."). Additionally, the Court credits Pilot's argument that Ms. Milliron, as a supervisor, was held to a different standard as being the "face of our organization in that community." The Court thus finds that Ms. Clinchoc and Mr. Domitrovich were not similarly situated comparators to Ms. Milliron to establish that Pilot's legitimate, nondiscriminatory reason for Milliron's termination was pretext.

Even were the Court to credit Ms. Milliron's contention that she, Ms. Clinchoc, and Mr. Domitrovich were similarly situated because the Substance Abuse Policy applied equally to all Pilot employees, Ms. Milliron's argument still fails. As Pilot points out, this argument overlooks Pilot's production of evidence that 66 other Pilot employees were terminated for violating the Substance Abuse Policy in the same region or zone as Ms. Milliron. Fifty-six of these 64 were younger than Milliron, and 55 of them were under the age of 40. The Third Circuit notes "that a plaintiff does not create an issue of fact merely by selectively choosing a single comparator who was allegedly treated more favorably, while ignoring a significant group of comparators who were treated equally to her." *Simpson*, 142 F.3d at 642.

The Court therefore concludes that Ms. Milliron has not adduced adequate evidence to create a genuine issue of material fact that Pilot's stated legitimate, nondiscriminatory reason for her termination was not its true reason, but was more than likely motivated by age-based discrimination.

For all of the foregoing reasons, Defendant's Motion for Summary Judgment will be granted and the Clerk will be directed to mark this case closed. An appropriate order follows.

**ORDER**

And Now, this 20th Day of August, 2009, IT IS HEREBY ORDERED THAT Defendant's Motion for Summary Judgment is Granted, and Judgment is Entered in favor of Defendant. The Clerk of Court is directed to mark this matter closed.

BY THE COURT:

*[signature]*

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE